Good morning, your honors. May it please the court. My name is Andrew Kaufman. I represent the petitioners. The petitioners would like to present two issues for consideration by the court today. The first issue is whether substantial evidence supports the adverse credibility finding made by the immigration judge and the BIA at the petitioner's removal hearing. That adverse credibility finding was based on a number of factors and primarily inconsistencies or alleged inconsistencies in the petitioner's... So you're under the Real ID Act though, correct? Yes, your honor. Okay. So how can we provide relief under the Real ID Act when the petitioner changed his story regarding whether his mother could sign her name or whether petitioner's son was present in the second arrest only after he was confronted with conflicting evidence and he changed his story? So how do we get past the Real ID Act on that? Well, regarding whether or not his son was present during his second arrest, he never said that his son was present during his second arrest. He was asked who was present during his second arrest and he said his wife, his parents, his grandfather, his siblings, and then he was asked, was your son present during your second arrest? He said, during my first arrest, he wasn't present. Then the attorney asked him, I'm talking about your second arrest and he said, yes. But he wasn't saying, yes, my son was present during my second arrest. He was saying, yes, I understand what you're talking about. Continue with your questions. So I think that for the BIA to say that he changed his testimony or that he testified that his son was present is a mischaracterization of his testimony. He couldn't really describe the purpose of the, I don't know if he said, is it Colorado Mission Committee? Can that be considered when evaluating his credibility since that's the whole purpose that he's, that's what he says he would be persecuted for? I don't think so, Your Honor. He, he, he never changed his testimony regarding what the, the mission of the Colorado Committee was. He, uh, he had some basic... He didn't seem to know anything about it. I think he testified... So, I mean, if you're going to get persecuted, shouldn't you know something about what you're so passionate about? I, I think his family was involved with this organization, and he was a member of the organization. He was not a very high-ranking member, and, um, I think he was persecuted in part because of his membership and, and attending, uh, some functions related to that organization, also because of his family's history in that organization. Um, but the fact that he didn't know a lot of the, uh, the, their mission statement or, um, everything that they, they do or stand for, I don't think that that means that he wasn't a member, that he wasn't credible. What about the other part of Judge Calhoun's question, the, uh, his answers to whether his mother could only use a thumbprint or could sign her name? Well, Your Honor, I think there were, there were five or six different factors that were cited by the IJ and the BIA in support of the adverse alleged inconsistency that was not actually inconsistent. It was just misconstruing his testimony because of very bad translation at the hearing. But regarding that one, uh, factor, whether or not his mother knows how to sign her name, he did initially say that she uses her thumb impression to sign her name, and then when he was shown an affidavit with his mother's name on it, he said, oh, I forgot she knows how to sign her name. And so that, that was the single factor that was cited by the BIA that actually is a technical inconsistency. But, uh, the petitioners would submit that it was a trivial inconsistency. It was ancillary to his claim. It did not relate to his actual experiences in India or his claim of persecution. It was, uh, it was, it was, it was, uh, well, that exhibit that he was shown, I mean, that was inevitable, right? Yes. It was, it's part of the record. Yes, Your Honor. So I was trying to figure out, well, he knows it's there. I mean, why would he lie about it? I mean, what's the purpose? Your Honor. That's something to gain from it, doesn't it? I, I don't think that he was lying about it. I think that he genuinely forgot. That's the explanation that he gave. So maybe the more rational explanation is, well, I can understand in that society, you know, he wouldn't very often see his mother sign her name or put a thumbprint on or, you know, whatever she had to do, because I think rarely would she ever be confronted with that kind of situation where a signature is required. That's my recollection of what happened over there. Anyway, so, uh, seems to me, uh, if there's no purpose in lying, nothing to be gained, uh, uh, uh, there's no reason to think he would do it deliberately. And, and as you said, it probably was, you know, just something he didn't, he didn't think about, didn't recall. This whole exchange took place over a matter of seconds during his hearing. And he said his mother uses his thumb impression and he was shown that affidavit or reminded about it. And he said, oh, I forgot. She, she is not very educated, but she can sign her name. Um, and I, I think that that standing alone is not sufficient to support an adverse credibility finding even under the Real ID Act. Um, there's a second issue that, that I think is very important that was not, uh, clearly discussed in the opening brief, but it was discussed in the petitioner's appeal to the BIA. And it was discussed in a letter citing supplemental authorities, uh, that was submitted to this court on August 6th. And that is whether the petitioners were deprived of due process because of incompetent translation at their removal hearing. That's your letter. I mean, right from your office. Yes, Your Honor. Yeah. Okay. Go ahead. And it's a little late to raise an issue. Well, Your Honor, I think that the issue was raised because in the brief, um, the petitioners discussed at length the fact that the translation was faulty at their hearing. Well, it may not be too late to, as part of an argument on another issue, but by itself as a claim, uh, it may be a little late to raise before us. As I said, it may be relevant to another issue to, to, in which you say it's not a lie. It's, uh, he didn't have trouble understanding, but to set it aside on the basis of false translation or faulty translation. Well, nevermind. Go ahead. Yeah. But the translation problems go to some of the, uh, some of the findings. There are several of, uh, of, uh, you know, uh, lack of credibility, right? Yes. So some of those could be attributed to, you know, uh, translation problems. And, and to the extent that you're saying that, that, that that's relevant to a claim that you have raised, that's not a problem to report, say it's a separate claim would be a problem. Well, Your Honor, I think that the, the incompetent translation at the hearing, uh, is relevant to both issues because one, uh... But it's pretty easy to do that as a standalone claim if that's going on. And so then to come up with that at the last minute is problematic as a standalone, you know, that's, that's pretty appellate 101. Well, right. Your Honor. Um, I, I think that... Otherwise people could just come here and surprise us every day or, you know, sandbag the other side. Yes. Um, well, I think that it, it's still an issue whether the response or whether the Well, but a due process claim is separate. But in terms of deciding whether the inconsistencies are enough to support the adverse credibility, you'll look at the record and if you think someone didn't understand, then you can argue it that way. But arguing a due process claim separate and apart, and I think that's what the other judges are saying, um, you know, you can't just sandbag people at the last moment on that. Yes, Your Honor. I understand. You might want to save your last 50 seconds for rebuttal. Um, okay. I, I will save, uh, the rest of my time. I, I just do want to say that, uh, the incompetent translation did affect almost every other inconsistency or alleged inconsistency that the BIA cited. I'll reserve the rest of my time. Good morning. Good morning, Your Honors. Fred Sheffield on behalf of the Attorney General. We're asking that you deny this petition for review, uh, because petitioners have not shown that lead petitioner, Mr. Singh, uh, was credible, uh, and that he has compelled the conclusion that he was credible, as he must do given the standard of review in this case. Well, the translation, it, it does appear that that problem existed there. So when we evaluate the inconsistencies and whether the substantial evidence supports the adverse credibility, it makes it a little bit more difficult to determine whether he was really saying what they thought he was saying. Sure. I mean, uh, with respect to the, the translation issue with the interpretation issue, I want to first just emphasize the point that I think Your Honors understand based on your question. We would argue that the issue of translation as to a due process issue was waived as it was never presented in the opening brief. Um, one of the cases actually that interpretation as a problem for a substantial evidence review actually draws a pretty firm distinction between arguing that translation is a problem for purposes of an adverse credibility decision versus, uh, a due process problem. But just to get to your, your, your question about whether translation was a problem here, I think what we see when we look at cases where the court has remanded based on problems with translation, first of all, it's, what we typically find is a petitioner who tells the immigration judge at some point, I'm having difficulty understanding the interpreter because of a problem with dialect or something else. Um, the Wang case. I know, but if you find that people are making ambiguous answers or sometimes they're responding in a way that doesn't seem to be responsive to what the question was, then you have to decide, you know, what did they really say? And so here, it's not the strongest adverse credibility, but you're under the Real ID Act. But, you know, maybe you want to address how he said about his son, the, you know, the signature and knowing about what this Clara missions is really about. Sure. I mean, there were, there were a lot of issues. I think generally with respect to all the translation issues, what we see is not the petitioner saying that, uh, that he's having difficulty understanding the interpreter. What we see is that after he's more or less, uh, called on an inconsistency, his response to that question then is I was confused, but it's, I don't recall too many instances where the problem stems first from the petitioner saying that I didn't understand. I don't understand the question. I, for example, one of the primary inconsistencies that the immigration judge and the board noted was the treatment that he was he hung upside down or was he not hung upside down? Now in their opening brief, petitioners attribute this problem to, they claim that the, the interpreter was confusing the words, time arrest, things of that sort. But if we look closely at what actually happened, this is on page one 85 and one 86, what petitioner was asked was during your arrest of February, 2006, which was the first arrest during your arrest of February, 2006, how were you treated? And he responded to this by saying, I was beaten with sticks and I was hung upside down. So it's pretty unequivocal that he's responding to something that he claims happened in February, 2006. And he's saying that what happened was I was hung upside down. Now, as the immigration judge and the board recognized, this was inconsistent with what he said in his declaration. Um, the inconsistency about the presence of his son that you mentioned, and that was discussed, uh, by, by petitioner, uh, he, is there some ambiguity as to whether petitioner was answering the question about the second arrest or simply confirming to council? Yes, I understand that you're talking about the second arrest perhaps, but on the next page, DHS council called this problem to petitioner called this problem to petitioner's attention and said, look, it's, it's not possible that your son could have been present because your son wasn't born yet. And petitioner's first response was why can't it happen? And only after it was explained to him again, he then came around to say, okay, I under, my son wasn't present. Now, if there was any problem, I mean, if, if there was any confusion, what's the significance of that testimony? What difference does it make whether your son was there or not? Well, the petitioner's claim is based on three arrests. And so the second one, right? This was the second one. And so the factual circumstances that the circumstances surrounding these arrests are entirely, uh, central to this claim. Was your dog there? He said, no, my dog wasn't there. And someone had a photo of the dog being there. I mean, is that circumstance of the arrest, right? I mean, how important is that? Why should he remember that? Well, first of all, I want to just again, remind the court that this is a real idea case, which means that we're talking about the totality of the circumstances. So I, I mean, I would argue that something of that sort, well, you think like if you're talking about his dog, it would, you know, it would be a ground for a finding lack of credibility. I think it's not inappropriate for the court or for the board and the immigration judge to look to petitioner's description of what that includes, who was present, whether that includes the number of people who came to arrest him, all of these factors. I mean, whether it was a dog that by itself may not support an adverse credibility decision, but we're not talking about that particular hypothetical. We're talking about, um, whether his son was present. It's certainly reasonable to think that someone would respond differently. His son was going to be pretty young in any event. Just born, right? Just within, you know, a few days, one way or the other. Isn't that what it amounts to? His son was born a month later. So I don't think it's unreasonable for the immigration judge to be concerned with the idea that someone would have not remembered whether his wife was eight months pregnant versus having an infant in the child, an infant in the house. Um, well, in a way, it was in the utero. I suppose that's, yes, you could, you could say that's true. But again, Your Honor, I mean, what's, what's important to note here is that none of these explanations that we've seen offered by petitioner throughout his brief and here at oral argument, none of these were ever offered by petitioner himself. Petitioner had the opportunity to discuss all of these problems. They were called to his attention immediately after these inconsistencies arose. And there was a redirect examination in this case. Redirect examination was, in this case, one question. But all of these issues were brought to the attention of petitioner as he was sitting in the courtroom. And they were certain, and petitioner's counsel at the hearing was certainly on notice that these were problems. And so if petitioner's explanation was that, well, when you, when I said yes, when discussing whether my son was present, I was actually responding to another question, that's something that would have been entirely appropriate to be discussed at redirect examination. In fact, that's the entire purpose of redirect examination. There was also inconsistencies about the timing of the arrests. Petitioner's declaration, he states, the first arrest happened in the evening. The second arrest happened in the evening. The third arrest happened around noontime, he says. When asked about these, when asked to describe what happened during the first arrest, he says the first arrest happened during the, quote, morning. Now, none of the arrests, according to his declaration, happened during the morning. So I think all of these inconsistencies to the immigration judge, and this is what we see as evident from the immigration judge's oral decision, all of these contributed to a sense that a memorized story. And that was the primary issue. It wasn't that any particular inconsistency necessarily stood out, but petitioner was trying to recite a memorized story. Now, the BIA seemed to place significant weight on the fact that the hospital record was dated before his treatment was completed. But isn't the simplest, most likely explanation of this fact is the records were dated on Singh's date of admission to the hospital? Is there any reason to conclude otherwise? Well, I think that usually when we see a record that's dated, it's dated on the issue, it's dated on the date that the record was created. So both of the hospital records that petitioner submitted are dated on the day that he was admitted to the hospital. But this, again, is something that petitioner would have known could be problematic while he's submitting these documents in advance. And if these were unusual hospital records that could create... Well, maybe they're not unusual in that area of the world. Maybe in that hospital, that's the way they keep the records. Well, if that's the case, Your Honor, that would have been something that would have been important for a petitioner to submit as evidence. Why would he think there's anything wrong with it? He sees hospital records the way they keep them. It's perfectly rational to keep a date and the date of admission. It's nothing that he would think was unusual. If I got a hospital record and I got it and I gave it to somebody, I would assume the hospital kept its records. That's the way they kept it. But the notion that the hospital would issue, would date a letter, more or less, on the date that petitioner arrived at the hospital rather than the date of the letter is, at this point, it's entirely speculative. The only reason that we're even talking about this is because this explanation was more or less invented in petitioner's brief. We don't have anything from the hospital to say this. We don't have anything from petitioner to say this, any letters from India. This is something that we're completely speculating about now. Did you say to him, this is an unusual thing? Can you get evidence from the hospital? They certainly asked him, can you explain this? Petitioners... Well, yes. He can't explain it other than that's the way the hospital keeps the records. It seems to me that if you don't like the answer, you can continue the hearing. You can try to find out something about it. You can ask him to try to find out about it. You can give him the opportunity to submit evidence, but you don't just assume he's lying. I realize my time's up, but if I can just answer your question, your honor. I just want to make the point, this isn't an instance where this case was denied because of corroboration. What you're talking about, this court has held in some cases that there's an obligation for the immigration judge to apprise a petitioner that certain corroboration will be required. This case wasn't denied where the petitioner was found credible and the case was denied based on a lack of corroboration. So that whole subset of cases involving notice wouldn't apply here. This was simply a petitioner who was testifying inconsistently with his records, with his own documentary evidence. And based on that reason, based on the other reasons I've discussed, based on the fact that petitioner hasn't shown that there was a meaningful problem with interpretation, we would again ask that the court deny this petition for review. Thank you. Thank you, counsel. You have about 53 different examples of the petitioner saying, I'm confused, I didn't understand what the interpreter just told me. Or the IJ reprimanding the interpreter for not translating properly. Or the interpreter flat out mistranslating a word or a phrase. Or the interpreter saying that she didn't understand something the attorney said or the IJ said or the petitioner said. So there was a lot of misunderstanding that led to these inconsistencies. One last point about whether or not the petitioner could have cleared these issues up on redirect. The IJ didn't tell the petitioner what she was going to say in her decision before she made the decision. She didn't tell the petitioner, I have an issue with this part of your testimony, I have an issue with this part of your testimony. So he didn't have any opportunity to explain himself there. He only did very briefly midway through his testimony. And each time he said, I didn't understand that that's the question I was being asked. Thank you counsel. The case in circuit will be submitted. Next case for oral argument is United States v. Decker.
judges: Reinhardt, Tashima, Callahan